BATTLE and others *v.* STREET and others.

*(Nashville.* December 16th, 1886.)

1. SUPREME COURT PRACTICE. *Overruling demurrer. Effect of. How far res adjudicata.*

A decree of this Court overruling, in general terms, a demurrer to a bill presenting distinct grounds for relief, does not adjudicate that such bill is maintainable in all of its aspects, but only that there is sufficient equity on its face to require an answer; and such decree does not preclude this Court from inquiring, upon a second appeal, into the legal sufficiency of any of the grounds for relief stated in the bill.

Cases cited and approved: Rodgers *v.* Dibbrell, 6 Lea, 69; Kirkpatrick *v.* Utley, 14 Lea, 97.

Cited and modified: McNairy *v.* Nashville, 2 Bax., 251; Jameson *v.* McCoy, 5 Heis., 108.

2. FRAUDULENT CONVEYANCE. *Binds grantor's heirs. Agreement in furtherance of, not enforced.*

A fraudulent grantor's heirs are bound by his deed, and cannot maintain a bill against the fraudulent grantee, to set it aside; and *a fortiori* they cannot maintain a bill to enforce, and obtain the benefit of, an agreement made by themselves, with the grantee, in furtherance of the original fraudulent scheme of their ancestor. In the former case they are repelled for their ancestor's fraud; in the latter, for their own.

Cases cited and approved: Taylor *v.* Harwell, 5 Hum., 331; Searcy *v.* Carter, 4 Sneed, 271.

Cited and distinguised: Sharp *v.* Caldwell, 7 Hum., 415.

Battle and others *v.* Street and others.

3. PARTNERSHIP. *Act of one partner. Liability of firm.*

Where a firm bought and paid for certain property, and the vendor deposited the money with one of the members of the firm, to be held until the purchasers should be satisfied with the title; the other members of the firm, in the absence of any knowledge or connection on their part with such deposit, are not responsible therefor, although the purpose of the partner receiving the money was to hold it for the indemnity of the firm.

---

### FROM WILLIAMSON.

---

Appeal from the Chancery Court of Williamson County. June Term, 1883. W. S. FLEMING, Ch.

J. G. WALLACE, R. M. EWING, J. G. SWIGGERT, and J. L. NOLAN, for Complainants.

D. C. CAMPBELL & SON, and TURLEY & QUARLES, for Respondents.

LURTON, J. Samuel M. Copeland in 1864 inherited from his brother, James C. Copeland, an undivided one-sixth interest in the estate of the latter. The interest, as it subsequently turned out, was altogether realty, the personalty being fully consumed in the payment of debts, as well as a part of the lands. Before division among the heirs, and before the settlement of the estate, Samuel M. Copeland, by deed duly registered, and for the nominal consideration of $3,000, conveyed this interest to his son, John B. Copeland.

On the 5th of January, 1869, Samuel M. Copeland died intestate, leaving a widow and twelve children, eight of whom were adults. On the same day of the burial of Samuel Copeland, a family conference was held at the house of the intestate, the persons present being the adult heirs of the deceased, eight in number, the married daughters being represented by their husbands. At this meeting John B. Copeland stated that he held the interest of his father in his Uncle James Copeland's estate, and that the agreement with his father was that he should give his notes to his father for $3,000, which were to be deposited with Richard Ransom, but that he was never to pay the notes and was to reconvey this interest to his father when it should be demanded. He said that he was willing to surrender this interest to the estate. G. W. Morton, a son-in-law, thereupon proposed that this interest should be sold to Green, Layne & Co., a firm of which he was a member, and that the fund should be invested in land and the title taken to Mr. Alexander, another son-in-law of the deceased, for the benefit of the widow and children of the intestate. He said he would "*consult*" his partners that night and report the next morning. The family council being again assembled, he reported that his partners would not agree to give more than $2,000 for the interest; that the defendant, Street, one of his partners, said that the debts against the estate filed amounted to $7,000 or $8,000, and there was no money to

pay them with, and that more land would have to be sold to pay these claims; and he, Morton, strongly urged that their offer should be accepted. This representation as to the condition of the estate of James Copeland undoubtedly had much effect in inducing an acceptance of this offer. John B. Copeland, the fraudulent vendee, however, objected to making a deed to Green, Layne & Co., and said that he would have nothing to do with the sale, as it would get him into a law-suit. His objections were, however, removed by the parties present all entering into bond to indemnify him against damage by reason of his conveyance, and he agreed, and did shortly thereafter, convey said interest by warranty deed to the defendants, Park Street, W. K. Green, Geo. Layne, and G. W. Morton, partners under the name of Green, Layne & Co. These defendants paid to him the sum of $2,000 in cash. This money, instead of being invested as had been agreed upon, was deposited by John with his brother-in-law, Geo. W. Morton, the latter giving a receipt in which he agreed to deposit the fund in a Nashville bank, there to remain until the purchasers should be satisfied with the title.

No part of this fund has ever come to the hands of complainants. This record shows, however, that the defendant, Street, after this sale, became the administrator upon the estate of Samuel Copeland; and the estate proving insolvent, he, in 1874, shortly before the filing of this bill, filed

his original bill as administrator in the Chancery Court of Williamson County against John Copeland, then a non-resident of the State, and Geo. W. Morton, a citizen of said county, charging that John Copeland was *indebted* to the estate of Samuel Copeland in the sum of $2,000, and that Geo. W. Morton had in his hands about that sum of money the property of John Copeland. Jurisdiction was acquired by attaching this fund in the hands of Morton and publication for Copeland. A decree was obtained against Copeland, not for the whole sum charged to be due as a debt, but for the sum shown to be necessary to pay balance due creditors of Samuel Copeland after exhaustion of assets in hands of his administrator, Street. This sum ordered to be paid over was about $1,200, and this was promptly paid over by Morton, the depositary. The remainder of this fund—about $800 — still appears to be in the hands of Morton. Morton was originally a party defendant to this suit, but pending the litigation has died, and there has been no revivor against his representatives.

There is no proof whatever showing that this fund was kept by Morton as a member of the firm of Green, Layne & Co., or that they had anything whatever to do with the fund after it was paid over to John, or procured or induced its deposit with Morton, or, indeed, that they had any knowledge that it was in Morton's hands until some time after the transaction.

The bill charges that this fund was retained by Green, Layne & Co., and seeks to charge them with this fund, as in their hands. The proof fails to make out any case upon this branch of the suit which would justify a decree against the partners of Geo. W. Morton upon account of his subsequent receipt of this fund from John Copeland. His act in this connection was his individual act. He did not pretend to receive it for the firm of Green, Layne & Co.; and the proof wholly failing to show that his partners received the fund from him, or adopted his receipt of the fund, they cannot be charged on account of his individual receipt of this money, even if his purpose was to hold it for the indemnity of his firm.

The complainants are ten of the twelve children of Samuel Copeland. The defendants are Park Street, W. K. Green, Geo. Layne, and Geo. W. Morton, composing the firm of Green, Layne & Co., and purchasers of the interest of Samuel Copeland in the estate of James C. Copeland. Louisa, the wife of Geo. W. Morton, and John B. Copeland are likewise made defendants. Park Street is sued individually as well as in his character as administrator of Samuel Copeland, the father of complainants.

The complainants charge that their father, a few months before his death, "being much embarrassed with debts, and being anxious to secure to himself a small amount for his support and maintenance and that of his large family, entered into

a fraudulent agreement with his son, the defend-
ant, John B. Copeland, whereby there was sought
to be concealed from his creditors an undivided
interest of one-sixth part in value in the estate
of his deceased brother, James C. Copeland; that
in the execution of this design he had conveyed,
on the 7th October, 1867, by his deed of that
date to his son, John B. Copeland, for the nom-
inal consideration of $3,000 as expressed on the
face of the deed, all his right, title, interest, and
claim in and unto the estate of his brother, James
C. Copeland."

The bill then sets out in detail the facts con-
cerning a family agreement, by which John Cope-
land was induced to sell and convey this interest
to Green, Layne & Co., the bill distinctly stating
that the proposition made to John Copeland, and
ultimately accepted by him, was that he, as "the
holder of the legal title to said interest, should
sell said claim for the *benefit of the widow and
children.*" The bill then charges that the sale was
made for $2,000, upon the representations of Morton
that the estate of James C. Copeland was much in-
volved, and that there was no telling how it would
turn out; that Morton knew that such was not
the case, and that in point of fact there was at
that very time over $1,200 in the County Court
due and payable on the share of Samuel Cope-
land in that estate, resulting from a sale of a
portion of the lands for partition; that Morton
knew that none of the persons interested knew

anything of the true condition of the estate, and that he knew and intended that they should rely upon him, and that he made these fraudulent representations for the purpose of inducing a sale at · a low price; that the defendant, Park Street, was fully aware of the condition of the estate of James Copeland, and that while the widow was the nominal administrator, yet that he (Street) was the real administrator. The bill further charges that Park Street was the administrator of Samuel Copeland, but does not state whether he had qual-. ified before the purchase of said interest, though the clear inference from the bill is that he was administrator at that time, for it specifically charges "that *Park Street, administrator,* etc., was *particeps criminis* in this fraud, and reaped, and is still reaping, the benefit thereof," and "that he should, as administrator, be charged with the full value of said interest, as assets in his hands for the payment of debts." This interest is stated to be of the value of over $4,000, and that the indebtedness of the estate was comparatively trivial. Green, Layne & Co. are charged with full knowledge of the fraudulent character of the conveyance from Samuel to John Copeland. The estate of Samuel Copeland is charged to be insolvent, and that the administrator had been repeatedly urged to sue for and recover this interest for the benefit of the estate, but ·had refused to do so, until a few days before he had filed the bill against John Copeland and Geo. Morton, hereto-

fore mentioned in this opinion. They say that if the administrator had filed a proper bill to recover the whole of said interest, "that the estate of Samuel Copeland, so far from being insolvent, will be found solvent, *with a surplus for the heirs at law.*"

In this last statement is manifestly found the object and purpose of this bill. "The surplus for the heirs at law" is the inducement to file this bill. Upon the facts herein stated, the bill prays relief as follows: "That the sale of the interest of Samuel M. Copeland, deceased, in the estate of James C. Copeland, above spoken of, may be declared null and void, as made by John Copeland, who had no power or authority to make such sale." "Or if mistaken in this, that the same may be set aside for fraud, as against the rights of creditors, and *particularly the minor heirs* of said *Samuel M. Copeland,* and the daughters not *sui juris.*" "That the defendants, Green, Layne & Co., be decreed to pay over into the hands of the Clerk and Master, for the use of the creditors of Samuel Copeland's estate and his heirs the amount in full and interest thereon received by them on account of said pretended sale."

The bill is filed by complainants in behalf of themselves and any of the "creditors of the estate of Samuel Copeland, who may seek to become parties to this suit, and contributing their share of the costs and expenses thereof."

A demurrer was filed to the bill, which was sustained by the Chancellor. Upon appeal to this Court the demurrer was overruled and the cause remanded for further proceedings. It is now most-strenuously insisted by counsel that the effect of overruling this demurrer is equivalent to an adjudication of the several questions of law arising upon the facts stated in the bill, and particularly is it insisted that the fraudulent character of the conveyance by Samuel Copeland to his son John Copeland, and the subsequent fraudulent sale of this interest for the benefit of the widow and children, a sale in manifest furtherance of the original fraudulent design of the intestate, will not estop complainants from maintaining this bill, this consequence flowing from the action of this Court in overruling the demurrer interposed by defendants. But it is to be particularly noticed that the decree overruling the demurrer assigns no ground for the action of the Court, and simply adjudicates that the demurrer is overruled and remands the cause for further proceedings. No opinion was filed by the Court from which we can determine the precise ground upon which the Court thought the demurrer bad. In this state of the case it is well settled by the later decisions of this Court, that such a decree, overruling in general terms a demurrer, adjudicates nothing but that there is sufficient equity upon the face of the bill to require an answer. *Rodgers* v. *Dibrell,* 6 Lea, 69; *Kirkpatrick* v. *Utley,* 14 Lea, 97.

In so far as these cases differ from the earlier cases of *McNairy* v. *Mayor of Nashville,* 2 Bax., 251, and *Jamison* v. *McCoy,* 5 Heis., 108, they necessarily modify the earlier opinions.

Manifestly, there is more than one phase of this bill which, if borne out by the proof, would probably entitle complainants to some relief. To illustrate: The bill makes a case of an insolvent estate; that the administrator is himself holding a large and valuable interest, acquired with knowledge that it had been fraudulently conveyed by his intestate, and that the administrator fails and refuses to bring suit to recover same. Now, the bill being filed upon this special state of facts, and for the *benefit of creditors,* it might in this aspect of the case be very well entertained.

The proof does not sustain the allegations which might justify the maintenance of this bill as a bill for the benefit of the creditors of an insolvent estate.

The defendant, Street, did not qualify as administrator of the estate of Samuel Copeland for several weeks after he had made the purchase of the interest of his intestate in the estate of James Copeland. Before a final decree was pronounced in this cause, the administrator's bill filed against John Copeland and Morton had resulted in the administrator's obtaining funds enough to pay all the creditors of the estate of Samuel Copeland in full, so that there are now no creditors to complain or be benefited by this bill.

In this view of the case, we reach the question as to whether this bill can be sustained by the heirs and distributees of the fraudulent vendor to recover the property so conveyed by him. If this interest was still in John B. Copeland, and this bill filed against him to set aside the conveyance from the ancestor of complainants upon the ground that it was, as expressly charged in the bill, for the purpose of hindering and delaying his creditors, it could not, for most obvious reasons, be entertained. The conveyance would be valid as between the fraudulent grantor and his grantee, and equally binding upon his heirs and representatives. Before the act of 1852, carried into the Code at § 3241, such a deed could not be impeached by the administrator of the fraudulent intestate under any circumstances. That act only permits recovery of property so conveyed in case of insolvency, and then solely for the benefit of the creditors. By this act the administrator is made the representative of the creditors of the estate to the extent that he may bring a bill in equity for their benefit to set aside a fraudulent conveyance to the prejudice of creditors. This Court has said that "in bringing such suit he is not acting in the proper capacity of representative of the estate, but rather in the new and different capacity of the representative of the creditors." *Baxter* v. *McKay*, 4 Sneed, 288.

A creditor, either with or without a judgment, may likewise file such a bill, for the conveyance

is of course fraudulent and void as to him. *Spencer* v. *Armstrong*, 12 Heis., 707; *Armstrong* v. *Croft*, 3 Lea, 191.

But is the status of these complainants in anywise changed by the facts concerning the sale of this interest to the defendants, Green, Layne & Co.? If the facts concerning the purpose of this sale be regarded as substantially stated by the bill of complainants, then we have a case where the fraudulent vendee is persuaded or induced to sell and convey the property so held by him "for the benefit of the widow and children" of the fraudulent vendor. The original purpose of the testator, as stated by complainants themselves in their bill, in making this conveyance, was "to secure to himself a small amount for his support and maintenance and that of his large family." Now it is so obvious that it needs no argument to sustain the proposition that this sale to Green, Layne & Co. was in direct furtherance of this original fraudulent scheme. It is not the case of a fraudulent vendee renouncing to those rightfully entitled all interest acquired by the fraudulent scheme. The case of *Sharp* v. *Caldwell*, 7 Hum., 415, is strongly urged upon us by the very able and zealous solicitors for these complainants. The facts in that case were materially different from the facts of this. In that case the Court say concerning the notes taken by Rivers, the fraudulent vendee, for the goods fraudulently conveyed to him:

"That if Rivers had claimed these notes, for which the goods were sold, as being his property, and had insisted on his right to the proceeds by virtue of the pretended sale of the goods to him, the administrator of Whitney (the fraudulent vendor) would have been repelled from a Court of Chancery had he come by his bill to set aside that sale as fraudulent and to obtain these effects as assets of the estate of Whitney. But the facts do not present that case. After the death of Whitney, Rivers set up no claim to these notes. He said the sale was a sham, and that the notes belonged to Whitney's estate, and *he delivered them up to be applied in payment of Whitney's debts.*"

The surrender of the notes to those rightfully entitled, and for the payment of the creditors, against whom only was the pretended sale void, marks the distinction between that case and this. It is true that the proof shows in this case that at the family conference the vendee confessed that the sale to himself was a sham, and expressed his willingness to surrender the interest thus acquired to the estate. If he had done this, and put the property back in the heirs of the vendor, where it would have been subject to the claims of creditors, this case would fall within the principle of the case relied upon. But this he did not do. Upon the contrary, the bill states that, under the suggestion of Morton, it was agreed that a sale of this interest should be made "for the benefit of the widow and children;" and the proof shows

that a part of the scheme agreed upon was that
the fund arising from this transaction, together
with about $5,000 belonging to the intestate, and
improperly in the hands of his widow, should,
instead of being turned over to the administrator,
be invested in a tract of land, and the title taken
to W. D. Alexander, one of the sons-in-law of
the intestate. The proof further establishes that
John Copeland positively refused to make the de-
sired deed to Green, Layne & Co., or to have any-
thing to do with the sale, upon the ground that
it would involve him in lawsuits. This objec-
tion was only yielded upon these very complain-
ants executing to him a bond to indemnify him
against the consequences of his further participa-
tion in this most iniquitous and fraudulent scheme.
The solemn pledge which each one of these com-
plainants then and there entered into never to di-
vulge the proceedings of that family council only
demonstrates that they themselves well realized
that their arrangement was only in furtherance of
the original fraud of their ancestor. What rights
these complainants have in this property they must
either acquire through their ancestor, the fraudu-
lent vendor of this property, or through the scheme
by which this property was sold to Green, Layne
& Co. for the benefit of themselves and the widow
of the grantor.

It is plain that as heirs and distributees of the
fraudulent vendor they cannot impeach his deed,
and it is equally as plain that the scheme in the

furtherance of the original fraud of their ancestor has conferred upon them no new rights. Originally complainants were only effected as heirs and privies in estate with the fraud of their father, but by this latter arrangement they became active participants and promoters of the fraud. The interest they have acquired through this sale and agreement with their brother, John Copeland, having originated in a gross and palpable fraud, must repel them from a court of equity. This Court will never lend its aid to enforce, or protect, or rescind, in behalf of the participants, claims or rights so originating.

In the case of *Taylor* v. *Harwell*, 5 Hum., 331, this Court declined to intervene and protect the property of a legatee whose testator's title had been acquired through fraud, even against persons who, by reason of the discharge of their debtor in bankruptcy, and by the fact that their executions were *functus officio*, were in no condition to attack the conveyance.

In the case of *Searcy* v. *Carter*, 4 Sneed, 271, the facts were that Searcy, by a deed fraudulent in law, conveyed certain slaves to one Bracken, and Bracken afterward, by will, gave the same slaves to Searcy for life, with remainder to the children of Searcy. Searcy, in defiance of the remainder interest of his children, sold the same slaves absolutely to one Carter. The remaindermen thereupon filed their bill against the purchaser, to have their rights declared and their in-

terests protected. It being made to appear that
the original sale by Searcy to Bracken, the tes-
tator, was fraudulent, and that Bracken partici-
pated therein, and that his will reconveying to
Searcy and his children the same slaves, was in
furtherance of the original fraudulent purpose, and
that the purchaser had given a fair considera-
tion and held for many years adversely to the
rights of the remaindermen, and dismissed the bill.

The Court, in answer to the argument that,
however fraudulent the purpose of Searcy in con-
veying the slaves to the testator, yet the title of
the testator had been cured by adverse possession
before execution of his will, and that the title
thus perfected he could convey by will to the com-
plainants, said that even if the statute of limita-
tions had been applicable "we would hold that
neither a fraudulent vendee nor volunteers under
him can demand the active interposition of a court
of equity for the declaration or protection of such
a title. Whatever the effect might be at law
under the all-curative powers of the statute, a
court of equity will withhold its hands on account
of the original fraud in the transaction. Whatever
stain was upon the hands of the testator is com-
municated with the gift to those of his legatees.
They cannot, then, be heard to claim the benefit
of the statute, or any other right springing out of
such corrupt transactions as complainants, in a
court of chancery." Whatever right complainants
acquired to a participation with John Copeland in

the fruits of the transaction between himself and his father, they acquired from and through the voluntary agreement of John Copeland to share the proceeds of sale with them.

"The destructive effect of fraud upon any contract, conveyance, or other transaction, is so essential and far-reaching that no person, however free from any participation in the fraud, can avail himself of what has been obtained by the fraud of another, unless he is not only innocent but has given some valuable consideration." 2 Pom. Eq. Juris., Sec. 899.

This doctrine, even if complainants were not active participants with John Copeland, would prevent a court of equity from actively aiding them to obtain a rescission of the sale to Green, Layne & Co. But it is unnecessary to place this case upon other ground than is taken in the foregoing part of this opinion—"that he who comes into equity must come with clean hands." The doctrine of this case applies as fully to the complainants who were not *sui juris* at time of sale to Green, Layne & Co., and to such of the complainants as did not personally participate, if there be any such, in the sale as to the adults, and for the obvious reason that if they repudiate the conveyance by John Copeland to Green, Layne & Co., or are not affected by the fraudulent agreement to invest the fund in a manner whereby creditors were to be defeated, they would, treating the sale by John Copeland as not complicating their rights,

be still affected by the fraud of their ancestor. They could neither recover the property from John Copeland or his vendees, the defendants in this case. The stain upon the hands of their ancestor, under whom they would have to claim, would equally affect them, and repel them as effectually as he would have been had he attempted a recovery or rescission of his fraudulent deed. The Chancellor dismissed the bill of complainants, and we affirm his decree. The Referees, in recommending a decree in behalf of complainants, have erred, and their report will be set aside.

Complainants will pay all the costs of the cause.

Turney, C. J., dissents from the conclusion reached, except as to the $2,000 paid over to John Copeland, for the reason that he is of opinion that when John Copeland expressed his willingness to surrender the property conveyed to him by his father in fraud of his creditors, that this was such a renunciation of the fraudulent deed as if carried into effect, would have restored the property to the heirs at law, subject only to the claims of creditors. That his failure to do what he proposed to do was wholly brought about by the suggestions of Morton that it should be sold to his firm and the fund invested for the benefit of the widow and children. That this conduct of Morton was to secure the interest for his firm, and was part of a fraudulent scheme to secure the property at a low price, and that his partners

are chargeable with the fraud of Morton, and ought not to be allowed to set up the conveyance to them as in furtherance of the original fraudulent purpose of the intestate of complainants, because the sale to them, and agreement to invest the fund for the benefit of complainants, was superinduced by the suggestion and fraudulent representation of Morton, all of which were made for the very purpose of procuring the property for them at a low price.