## LOOKOUT MOUNTAIN R. Co. *et al. v.* HOUSTON *et al.*

(*Circuit Court, E. D. Tennessee, S. D.*   December 2, 1890.)

1. REMOVAL OF CAUSES—RES ADJUDICATA.
   Where a suit is removed to a federal court after the state supreme court has passed upon a demurrer filed in the suit, the decision on such demurrer is binding on the federal court.

2. CONTRACT—EVIDENCE.
   In a suit upon an alleged parol agreement by railroad contractors to assume the debts of the railroad company, the defendants denied making the agreement, and two of the company's directors, who were present at the meeting at which said agreement was alleged to have been made, corroborated their testimony. Two other directors and the secretary of the company testified that the agreement was made. Shortly after said meeting, one of the defendants wrote a letter to the secretary of the company, in which he questioned the correctness of a statement of the company's debts, and promised to refer it to defendants' agent, but did not deny their liability for the debts. *Held,* that the evidence was sufficient to establish the contract.

In Equity.

*C. P. Goree* and *Richmond & Chambers*, for complainants.

*Clark & Brown,* for defendants.

KEY, J.   About the year 1880, the complainant railroad undertook to build a line of road from Chattanooga, Tenn., to Rome, Ga.   The contract for the building of the road was first made with J. C. Stanton & Co., but, before much work was done, J. C. Stanton & Co. surrendered their contract, and it was canceled, and a new contract was made with the defendants.   They were to complete the road ready for the rolling stock within a year, and were to be paid per mile $8,000 of the paid-up capital stock, and $22,000 in the first-class mortgage bonds of the company.   The bonds and stocks were to be issued, as needed, at the request of the defendants.   This contract was reduced to writing, and executed by the parties.   There is no dispute as to this contract, which was written, but complainants alleged that there was an oral understanding and agreement made at the same time, that the defendants would pay all the debts of the railroad and also the debts and expenditures made by J. C. Stanton & Co. under their contract.   Defendants deny that there was any such oral contract, and insist that it would not be binding.   Complainants filed their bill, alleging that the debts mentioned in their bill were to be paid under this agreement.   The cause began and was for some time prosecuted in the state court.

Our attention must first be directed to a demurrer which was disposed of in the supreme court of the state.   Defendants' counsel insists that the judgment of the court upon the demurrer was erroneous upon principle and upon authority, is not conclusively binding on this court, and should be disregarded.   In *Duncan* v. *Gegan*, 101 U. S. 812, the court held that—

"The transfer of the suit from the state court to the United States court did not vacate what had been done in the state court previous to the removal. The circuit court, when a transfer has been effected, takes the case in the con-

dition it was when the state court was deprived of its jurisdiction. The circuit court has no more power over what was done before the removal than the state court would have had if the suit had remained therein. It takes the case up where the state court left it off."

Section 721, Rev. St., provides that the laws of the several states, except where the constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States, in cases where they apply. It has been said:

"This court does not claim any supervisory or appellate power over the state court or judge. It merely entertains jurisdiction of this suit because of the citizenship of the plaintiff, and, being thus called on to administer a law of the state of Georgia, it will, if possible, follow the decision of the state judge. A state statute, when it appertains to rights and titles in things having a permanent locality, and a construction is placed upon it by the highest state court, becomes a rule of decision in the federal courts; but the rule does not apply to contracts." *Guano Co.* v. *Morrison,* 2 Woods, 395–406.

Justice CLIFFORD states the matter thus:

" 'Infinite mischief would ensue,' says MARSHALL, C. J., 'should this court observe a different rule in construing the statutes of a state from that established by the judicial authority of the state. *McKeen* v. *Delancy's Lessee,* 5 Cranch, 22. In cases depending on the statutes of a state, the federal courts adopt the construction given to the statute by the highest court of the state, where that construction is settled, and can be ascertained. *Polk* v. *Wendal,* 9 Cranch, 98; *Elmendorf* v. *Taylor,* 10 Wheat. 157.' " *Merrill* v. *City of Portland,* 4 Cliff. 138–147.

The supreme court of the United States announces this doctrine: ·

"Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that, by the course of their decisions, certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the constructions of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they always do in reference to the doctrines of commercial law and general jurisprudence. So, when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But, even in such cases, for the sake of harmony, and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts, if the questions seem to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts." *Burgess* v. *Seligman,* 107 U. S. 34, 35, 2 Sup. Ct. Rep. 10.

The doctrine asserted in this case is sustained and declared in *Enfield* v. *Jordan*, 119 U. S. 680, 7 Sup. Ct. Rep. 358, and in many other cases, but it applies to cases that are alike in their principles and features, but yet different cases for decision, and having been determined by the state and federal tribunals, each forum deciding its case for itself; and the question is how far the federal court in its case is to follow the decision of a state in a like case. Whether or not a state court is followed in its decision in the federal court has no effect upon the suit decided by the state court. The decision stands as the law of the case. The last decisions referred to have no application to the case on trial. This case was brought in the state court. The defendants came into that court, and filed a demurrer to the bill. The chancellor sustained the demurrer, and ordered the bill dismissed. From that decree complainants appealed to the supreme court of the state, its highest judicial tribunal. The supreme court reversed the action of the chancellor, overruled the demurrer, and sent the case back for answer to the merits. It is now insisted that the action of the supreme court was erroneous and the action of the chancellor right, and this court, it is insisted, should so determine, or, at least, disregard the decision of the supreme court as not binding on this court. After the case was sent back to the chancery court, the defendants removed it to this court upon the ground that, because of local prejudice or influence, they could not obtain justice in the state courts. The state courts had lawful and complete jurisdiction of the case until it was removed to this court. The chancellor had authority, and it was his duty, to hear and decide upon the matters raised by the demurrer, and the supreme court had authority, and it was its duty, to pass upon the action of the chancellor, and affirm or reverse it. When the cause came to this court, it came bodily. None of it remained in the state court. It came here the same case that it was in the state court, and in precisely the condition the state court left it when this court took it in hand. Under the twenty-fifth section of the judiciary act, as modified by an act approved February 5, 1867, (14 St. at Large, 385,) where there is drawn in question the validity of a treaty or statute of, or an authority exercised under, the United States, and the decision is against their validity; or where there is drawn in question the validity of a statute of, or an authority exercised under, any state on the ground of their being repugnant to the constitution, treaties, or laws of the United States, and the decision is in favor of their validity; or of the constitution, or of a treaty or statute or commission held under the United States, and the decision is against the title, right, privilege, or exemption specially set up or claimed by either party under such clause of the constitution, treaty, statute, or commission,—the final judgment or decree of the highest court of the state may be re-examined and reversed or affirmed in the supreme court of the United States upon a writ of error as from a circuit court of the United States. A district or circuit court of the United States has no appellate or supervisory authority over any decision, decree, or judgment of a state court; nor does the supreme court of the United States have such, except as provided

for in the twenty-fifth section of the judiciary act, referred to, and the act of 1867.

Besides the decisions mentioned, there are numerous decisions of the federal courts—an unbroken line—to the effect that the judgments and decrees of state courts cannot be reviewed or supervised by the federal courts except where a writ of error lies, as above indicated. This court is bound to respect the decision of the supreme court of the state in its judgment in regard to the demurrer, and regard it as a determination binding upon this court, even though it might be erroneous. The decision of the state supreme court in this case is found in 85 Tenn. 224–226, 2 S. W. Rep. 36. It says:

"Houston & Co. interpose a demurrer upon several grounds, the only one of which that was pressed in the court below or in this court is that the bill shows a promise, not in writing, to pay the debt of another, and, as such, is void under the statute of frauds and perjuries. The demurrer was sustained by the chancellor, and complainants have appealed. In this we think there is manifest error. The verbal promise or agreement by Houston & Co. to pay these debts was the consideration for which Stanton & Co. surrendered their contract, and for which the railroad company canceled that contract, and entered into a less advantageous one with the defendants. The contract of Houston & Co. to pay such debts is 'a new and original undertaking,' upon a valid consideration passing at the time, and does not fall within the statute."

All that the court decides is that the undertaking to pay complainants' debts was not within the statute of frauds, and therefore need not be in writing; but that much it did decide. This case is not like that of *Battle* v. *Street*, 85 Tenn. 291, 2 S. W. Rep. 384. In this last case there was a demurrer which was sustained by the chancellor, but, on appeal, was overruled by the supreme court. After the case was sent back, it was insisted that the overruling of the demurrer was equivalent to an adjudication of the several questions arising upon the state of facts stated in the bill. The court said:

"It is to be particularly noticed that the decree overruling the demurrer assigns no ground for the action of the court. No opinion was filed by the court from which we can determine the precise ground upon which the court thought the demurrer bad. * * * Such a decree, overruling in general terms a demurrer, adjudicates nothing but that there is sufficient equity upon the face of the bill to require an answer."

In the case in hand we do have an opinion of the court giving the reasons for the action of the court. It determines, however, but one question, and that is that the promise to pay the debts alleged in the bill, as therein alleged, need not be in writing. Every other question of law, or fact, or equity is left undetermined. It is insisted that oral testimony cannot be admitted to enlarge or add additional obligations to the written agreement, and the proposition is generally true as to such matters; but in this case, if the parol agreement be proven at all, it must be admitted that the testimony which establishes it also proves a state of facts which makes the contract an exception to the general rule; for it would make it appear that it was not included in the written contract at the request of the defendants, and for their advantage and benefit.

The great question which confronts us is, was there any such oral agreement? There is strong testimony on both sides. Gentlemen of high standing and excellent reputation differ widely as to the facts. It is no easy matter to come to a satisfactory conclusion as to what is established. It does not appear that defendants did any work, or that the railroad company issued any certificates of stock, or executed any mortgage, or issued any bonds. The work of building the road has long since been abandoned, so that, if any vitality remains in this corporation, or anything survives for it or its creditors, it is the obligation arising from this parol contract on the part of the defendants to pay the debts of the railroad company existing when the contract was made, and the debts and expenditures of J. C. Stanton & Co. under their contract. The agreement between the parties died in all other respects. The defendants did nothing, and its whole project failed. At first blush it would seem that the railroad company did so little—slept so deeply in the execution of its enterprise—that it would have justified the contractors in regarding the contract as abandoned. The subscriptions to its stock were never collected. It had no treasury, or, if it did have it, there was nothing in it. It executed no mortgage. It issued no bonds. It was certainly as lifeless as a living thing could be. It paid its officers nothing, and they are now among the complainants, asking the defendants to pay their salaries earned prior to the contract asserted. The defendants were never paid anything. The written agreement is remarkable in its terms and stipulations. The company promised to pay the contractors in securities; that is, in paid-up capital stock and in first mortgage bonds. There were to be issued a series of 1,800 bonds, of $1,000 each. The capital stock was to be $750,000, and the consent of the defendants in writing should be necessary before it could be increased. The railroad, at any time the defendants were to so request in writing, was to issue bonds or stock, or both, with which the defendants were to purchase material and iron for the construction of the road. The railroad company could not make any other contract or sell either bonds or stock without the written consent and permission of the defendants, and the defendants were at all times to have the right and option to sell and dispose of all the bonds embraced in the series of 1,800. The railroad company was to assist the defendants in negotiating and selling their securities, and to use its influence in keeping up their price. The defendants were to have full and sole control and management of the railroad until completed, and the work on said road and its manner of execution. Under this agreement, there was little for the railroad company to do but to obey the behests of the defendants; so that the great responsibility of the failure and abandonment of the enterprise would rest in a larger degree upon defendants than upon the railroad company. We go back to the testimony in regard to the alleged parol contract.

There were present at the time the contract was made with the defendants four of the directors of the railroad company. Two of these (one of them its president, who presided at the meeting which agreed to the contract) testify that no such contract was made, as the oral one alleged

in the bill; that the written contract embraces the entire agreement between the parties. One of these directors is asked if Mr. Goree did not inquire of him, immediately after the adjournment of the meeting, if provision had been made for the creditors of the railroad, and if this director did not reply that provision had been made, and stated that the defendants had agreed to pay the debts of the railroad. In reply he states that he has no recollection of such conversation. Mr. Goree testifies positively, and with convincing particularity, that such a conversation did occur. The director's statement to Goree is not evidence of the contract, but the contradiction of his material statement weakens the value of his recollection.

In addition to the testimony of the two directors mentioned in regard to the parol contract, the three defendants swear positively that no such contract was made, or even discussed. Two of them, Houston and Kinsey, were present during the entire meeting, they say. Neely says that he did not come to the meeting until a short time before it adjourned. On the other hand, two of the directors who were present swear that such a contract as is alleged was not only made, but was discussed; that the amount of the debts was estimated at from $8,000 to $10,000; that one of the directors stated that he would withdraw, and leave the meeting without a quorum, if provisions were not made for the payment of these debts; that thereupon the defendants agreed to pay them, one of the directors says, to the amount of $8,000. They both say that it was proposed to embody this provision in the written contract, but the defendants insisted that it should not be done, because, as one of these directors says, if such a stipulation was placed where every one could read it, it would injuriously affect the negotiability of the bonds. The other director says that they said it would prevent a favorable compromise of the debts. The secretary of the railroad company, who was present at the meeting, corroborates these last directors distinctly, explicitly, and in quite a forcible statement of the entire transaction. The defendants say that if the payment of these debts had been required of them, they would never have undertaken to build the road. It appears from their own statements, or at least of one of them, that they were bidders for a lease of the Cincinnati Southern Railroad, which had just been completed, and that the hope of obtaining this lease was the inducement for entering into this contract. They agreed with J. C. Stanton that, in the event he would surrender his contract, he might become a member of their firm, and they would allow him a credit for the work he had done, provided their track should be located upon his track, as worked. They purchased of Hardin his stock in the railroad, which was worth nothing at all, as not one dollar had ever been paid upon it, for which they paid him $1,000 in money, and agreed to pay him $4,000 in bonds of the road. They say they did this to get him out of the way, so that he might not give trouble about the charter to the railroad, to which he laid some claim. These transactions indicate an anxiety upon their part to secure the contract for building the road, which might not have been overcome by an additional obligation

to pay not more than $8,000. The proof justifies the conclusion that all interest and anxiety in connection with the building of the road ceased when defendants failed to obtain a lease of the Cincinnati Southern Railroad, and that from that time they desired to escape from their obligation.

The secretary of the railroad company gives much testimony in regard to what is contained in its books, and in relation to the correspondence between him and the defendants, that is properly excepted to by defendants, but there is sufficient competent testimony to show that, very soon after the contract of May 11, 1880, had been made, there was a general conclusion on the part of the creditors of the railroad company that these debts were to be paid, and they made a simultaneous movement to have them paid. The secretary wrote to some of the defendants in relation to the payment of these debts, and sent him a list of them. The most powerful evidence sustaining and corroborating the testimony of complainants' witnesses is a letter, written, evidently, on July 6, 1880, by defendant Kinsey, and addressed to the secretary. In this letter he says:

"I have yours of 3d with claims that I have never heard of before except the $950 for paying the printing of bonds. Mr. Stanton has some vouchers which he paid, not to exceed $1,000, which I have written to him for. Perhaps they may cover some of the items you sent. I have referred your letter to Mr. C. G. Samuels at Rome, who is the responsible party in such matters."

There is no word of denial of the liability of the defendant for the valid and unpaid debts of the railroad. The whole scope of the letter is a tacit admission of such liability. In this connection it may as well be stated that Samuels acted for the defendants in the purchase of Hardin's stock, and that he tendered his resignation as director May 13, 1880, that he might "accept a position in the syndicate with R. G. Houston & Co." It is possible, but it seems hardly probable, that the defendants and their witnesses might have forgotten all about this parol contract. It is certain that the witnesses for the complainants could not detail the facts they do, and as they do, without being guilty of swearing falsely, if the facts stated by them are not true. They deal with affirmative, positive matters, that they say did take place. The testimony of defendants and their witnesses is not strictly negative testimony, but it is such as, in its nature, is negative. It has been held by the supreme court of the United States that it is a rule of evidence that ordinarily a witness who testifies to an affirmative is to be preferred to one who testifies to a negative; because he who testifies to a negative may have forgotten, while it is impossible to remember what never happened. *Stitt* v. *Huidekopers,* 17 Wall. 384.

The conclusion arrived at is that the parol contract was made as alleged by complainants, and that they are liable thereon to an amount in the aggregate of $8,000 should the debts foot up so much. The clerk, as special master, will report what debts of the complainants were due from the railroad company on the 11th of May, 1880, or before, their amount, and to whom payable. Vance's claim will not be reported. Such officers of the railroad company as may have such debts will not

be allowed interest thereon. It appears that no salaries had been fixed by their company; that it had an empty treasury, and was not collecting, or attempting to collect, its stock subscribed, except to a very limited extent, and that it was largely an experimental and inflated enterprise, which they must have known, so that the principal is a full satisfaction for debts of so little merit. Interest will be allowed to the other creditors. The clerk may look to the competent testimony on file, and take such other as he deems necessary and proper in his investigation.